# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| KENDRALIA KRETZSCHMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-02207-JEO |
| | ) | |
| BIRMINGHAM NURSING AND | ) | |
| REHABILITATION CENTER EAST, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This action involves claims for race discrimination, retaliation, and hostile work environment brought by plaintiff Kendralia Kretzschmar, an African-American female, against her former employer, defendant Birmingham Nursing and Rehabilitation Center East, LLC ("Birmingham East"). Kretzschmar worked at Birmingham East from July 2012 through September 2013. Her claims are based on three primary sets of allegations. First, Kretzschmar alleges that Birmingham East promised in June 2013 to promote her to the position of Assistant Director of Nursing, but one month later "demoted" her to her prior position because of her race. Second, she alleges that Birmingham East suspended her without pay because of her race. Third, she alleges that Birmingham East

1

retaliated against her, and ultimately terminated her, for complaining about race discrimination.

Before the court are Birmingham East's motion for summary judgment (doc. 41) and motion to strike certain exhibits submitted by Kretzschmar in response to the motion for summary judgment (doc. 51).[1]  For the reasons set forth below, Birmingham East's motion to strike will be granted in part and denied in part and its motion for summary judgment will be granted.

## PROCEDURAL HISTORY

Kretzschmar initially filed this action against Birmingham East and its Executive Director, Melody Burch.  (Doc. 1).  In Kretzschmar's original complaint, she cited a litany of federal employment law statutes: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; 42 U.S.C. § 1981 ("Section 1981"); 42 U.S.C. § 1981a;  42 U.S.C. § 1983 ("Section 1983"); the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 626 *et seq.*; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* (Doc. 1 at ¶ 1).  She did not state her claims in separate counts, but rather lumped all of her claims into a single paragraph that accused Birmingham East and Burch of discriminating and

---

[1] References to "Doc. __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

retaliating against her with respect to "job duties, and assignments, job evaluations, pay, working conditions, hiring, promotion, hostile work environment, discipline, and other terms and conditions of employment" in violation of all of the statutes she had cited. (Doc. 1 at ¶ 20).

Birmingham East and Burch filed a motion to dismiss the complaint for insufficiency of service of process under Rule 12(b)(5) of the Federal Rules of Civil Procedure and failure to state a claim upon which relief may be granted under Rule 12(b)(6). (Doc. 7). Kretzschmar filed an opposition to the motion to dismiss, as well as a motion for leave to file an amended complaint that named Birmingham East as the only defendant.[2] (Doc. 16). She also obtained proper service on Birmingham East.

The Court held a telephone conference with the parties to clarify their respective positions on the pending motions. During the call, Kretzschmar's counsel confirmed that Kretzschmar did not intend to pursue any claims against Burch as reflected in her amended complaint. Based on that representation, the Court granted Kretzschmar's motion to file the amended complaint and noted that Burch was no longer a defendant. (Doc. 26). The Court also advised the parties that it would treat Birmingham East's pending motion to dismiss Kretzschmar's original complaint as a motion to dismiss the claims in her amended complaint,

---

[2] Kretzschmar's amended complaint referenced the same employment law statutes as her original complaint, except for Section 1983.

based on the parties' representations that the motion to dismiss was ripe for decision and that they had no additional arguments to submit. (*Id.*)

Unlike her original complaint, Kretzschmar's amended complaint is divided into four counts. Count One alleges race discrimination, Count Two alleges retaliatory discharge, Count Three alleges reprisal, and Count Four alleges a hostile and abusive work environment. (Doc. 28). The Court granted in part and denied in part Birmingham East's motion to dismiss the amended complaint. The Court dismissed many of Kretzschmar's claims (including any ADA, ADEA, and FLSA claims), but allowed the following claims to go forward: Kretzschmar's claims under Title VII and Section 1981 alleging race discrimination as to her "suspension, demotion, and pay reduction" in July 2013; (2) her claims under Title VII and Section 1981 alleging retaliatory discharge; (3) her claim under Section 1981 for retaliatory acts other than discharge; and (4) her hostile work environment claim under Section 1981. (Docs. 32 & 33).

Birmingham East has now moved for summary judgment on Kretzschmar's remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 41). Kretzschmar has submitted a response in opposition to the motion for summary judgment (doc. 47), along with a number of exhibits. (Docs. 47-1 through 48-9). Birmingham East has filed a motion to strike many of the exhibits. (Doc. 51). Because the Court's ruling on the motion to strike will impact its

consideration of Birmingham East's motion for summary judgment, the Court will first address the motion to strike, and will then turn to the motion for summary judgment.

## I.  MOTION TO STRIKE

Kretzschmar's response to Birmingham East's motion for summary judgment includes (among other exhibits) email correspondence that appears to relate to the Charge of Discrimination she filed with the Equal Employment Opportunity Commission ("EEOC") (Ex. 1, docs. 48-1 through 48-6); the Affidavit of Letosha Van Buren, a former Staff Assistant at Birmingham East (Ex. 5, doc. 47-4); the Affidavit of Anita White, a former Certified Nursing Assistant at Birmingham East (Ex. 6, doc. 47-5); the Affidavit of Kimmie Harris, a former Licensed Practical Nurse at Birmingham East (Ex. 9, doc. 47-8); and the Affidavit of Luther Danzy, a visitor at Birmingham East (Ex. 14, doc. 47-13).  Birmingham East has moved the Court to strike the EEOC correspondence, the White, Harris, and Danzy affidavits, and portions of the Van Buren affidavit.  Kretzschmar has not opposed or otherwise responded to the motion to strike.

## A.    Standard of Review

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment. *Hetherington v. Wal-Mart, Inc.*,

511 F. App'x 909, 911 (11th Cir. 2013).[3] The Supreme Court has held that the nonmoving party is not required to produce evidence "in a form that would be admissible at trial in order to defeat summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This "simply allow[s] *otherwise admissible* evidence to be submitted in *inadmissible* form at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillan v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis in original). In this regard, "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," although a district court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (footnote, internal quotations, and citations omitted). In addition, "[u]nsworn statements do not meet the requirements of Rule 56" and are not considered by the court in ruling on a motion for summary judgment. *Dudley v. City of Monroeville*, 446 F. App'x 204, 207 (11th Cir. 2011); *see also Rhodes v. Tuscaloosa Cnty. Bd. of Ed.*, 935 F. Supp. 2d 1226, 1233 (N.D. Ala. 2013) ("The court does not consider unsworn statements.").

---

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

**B.     EEOC Correspondence**

Exhibit 1 to Kretzschmar's response contains a number of emails between Kretzschmar and Lashaundra Love, the EEOC investigator assigned to investigate her EEOC Charge. (Docs. 48-1 through 48-6).  Specifically, Exhibit 1 contains an email from Love to Kretzschmar summarizing Birmingham East's response to her EEOC Charge (*see* doc. 48-1 at 3-4; multiple copies of the email are included in Exhibit 1), and a series of emails from Kretzschmar to Love responding to Birmingham East's position and reciting various allegations against Birmingham East (docs. 48-1 at 2-3 & 48-6 at 2).  Exhibit 1 also includes a lengthy unsworn statement, presumably provided by Kretzschmar to the EEOC, discussing her allegations against Birmingham East in detail (docs. 48-3 at 4-5 & 48-4 at 2-5).[4] Birmingham East argues that the EEOC Correspondence, none of which is authenticated, should be stricken because it is inadmissible hearsay. (Doc. 51 at 6-9).  The Court agrees with Birmingham East.

The Court first notes, again, that Kretzschmar has filed no opposition or other response to Birmingham East's motion to strike.  She has made no effort to authenticate any of the documents in Exhibit 1, and has not challenged Birmingham East's assertion that the EEOC Correspondence is inadmissible

---

[4] For purposes of Birmingham East's motion to strike, the Court will assume that the unsworn statement in Exhibit 1 is further correspondence from Kretzschmar to the EEOC, and will refer to the emails and the unsworn statement collectively as "EEOC Correspondence."

hearsay. Indeed, Lashaundra Love's email summarizing Birmingham East's position is double hearsay, as it contains Love's recitation of the information she was provided by Birmingham East. *See United States v. Robinson*, 239 F. App'x 507, 508 (11th Cir. 2007) ("Hearsay is a 'statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Fed. R. Evid. 801(c). Hearsay within hearsay, or so-called 'double-hearsay,' is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. Fed. R. Evid. 805."). Kretzschmar has not argued that any of the statements in Love's email constitute non-hearsay evidence or conform to an exception to the hearsay rule.[5] Kretzschmar's own emails and her unsworn statement are hearsay as well, as they are out-of-court statements offered by Kretzschmar for the truth of the matters asserted therein. They are also double hearsay to the extent Kretzschmar repeats information she allegedly learned from other employees, including Shaunnan Cook and Blake Steapleton. (*See* Doc. 48-1 at 2). Again, Kretzschmar has not argued that any of these statements fit within an exception to the hearsay rule. Moreover, all of the statements in the EEOC Correspondence are unsworn.

---

[5] The Court notes that to the extent communications from Love to Kretzschmar include statements or positions purportedly advanced by Birmingham East to Love, they might be admissible evidence as opponent-party statements (*see* Fed. R. Evid. 801(d)(2)). However, consideration of these matters does not alter the Court's determination of the summary judgment motion.

Accordingly, the Court will grant Birmingham East's motion to strike the EEOC Correspondence in Exhibit 1. *See Rhodes*, 935 F.3d at 1236-37 (striking unauthenticated email from plaintiff and observing that "plaintiff does not argue that the email—her own out-of-court statement—or the statement of [a third-party cited in the email] are admissible testimony"). The Court has not considered the EEOC Correspondence in ruling on Birmingham East's motion for summary judgment.[6]

## C. The Affidavits of Anita White, Kimmie Harris, and Luther Danzy

Kretzschmar has also submitted affidavits signed by Anita White, Kimmie Harris, and Luther Danzy. Anita White is a Certified Nursing Assistant who worked at Birmingham East from August 2010 to January 2014. In her affidavit, White offers testimony regarding alleged nepotism and racial tension at Birmingham East. (Doc. 47-5). Kimmie Harris is a Licensed Practical Nurse who worked at Birmingham East for an unidentified period of time. She has offered affidavit testimony concerning the documentation of medication errors at Birmingham East. (Doc. 47-8). Luther Danzy visited a Birmingham East resident, the father of a friend, multiple times from 2012 to 2014. In his affidavit, he expresses speculative opinions on the treatment the resident, an African-American,

---

[6] The Court notes that Kretzschmar offered deposition testimony concerning many of the matters discussed in the EEOC Correspondence. The Court has considered her deposition testimony in ruling on the motion for summary judgment.

received at the facility. (Doc. 47-13). Birmingham East has moved the Court to strike all three affidavits because Kretzschmar never identified White, Harris, or Danzy as witnesses prior to submitting their affidavits in opposition to the pending motion for summary judgment. (Doc. 51 at 2-5).

Rule 26(a) of the Federal Rules of Civil Procedure requires a party to provide "the name … of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses …." FED. R. CIV. P. 26(a)(1)(A)(i). If a party fails to identify a witness as required by Rule 26(a), the party is not allowed to use the witness "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "'The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party.'" *Mitchell v. Ford Motor Co.,* 318 F. App'x 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.,* 233 F.R.D. 687, 697 (N.D. Ga. 2006)). Among the factors courts consider in deciding whether to exclude testimony from a non-disclosed witness are "(1) the importance of the testimony; (2) the reason for the [plaintiff's] failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify." *Pete's Towing Co. v. City of Tampa*, 378 F. App'x 917, 920 (11th Cir.

2010) (quoting *Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.* 389 F.3d 1339, 1353 (11th Cir. 2004)) (quotation marks omitted).

Here, it is undisputed that Kretzschmar did not identify Anita White, Kimmie Harris, or Luther Danzy in her Rule 26 disclosures.[7] Kretzschmar also failed to identify White, Harris, and Danzy in her response to Interrogatory No. 16 of Birmingham East's First Interrogatories, which asked her to identify "every person" who she believed had "personal information" regarding her claims and/or Birmingham East's defenses.[8] (*See* Doc. 35-1 at 5). In addition, Kretzschmar did not mention White, Harris, or Danzy at any point during her deposition. (*See* Kretzschmar Dep., Docs. 43-1 through 43-3).

Kretzschmar has not even attempted to explain why she never disclosed White, Harris, and Danzy as potential witnesses prior to submitting their affidavits, much less argued that the failure to disclose was substantially justified or harmless. Birmingham East has certainly been prejudiced by Kretzschmar's actions; because Kretzschmar did not disclose White, Harris, and Danzy as individuals with discoverable information she might use to support her claims, or identify them as persons with personal information regarding her claims, Birmingham East had no

---

[7] Kretzschmar's Rule 26 disclosures identified only five potential witnesses: Amanda Gillott, Shaunnan Cook, Dakota Cheatham, Melody Burch, and Letoria Moore. (*See* Doc. 51 at 16-17).

[8] Kretzschmar responded that she had "already given this information … in her initial disclosure." (*See* Doc. 51 at 20).

reason or opportunity to depose them before the close of discovery and before Kretzschmar submitted their affidavits. *See Moore v. Corp. Facilities Mgt., L.L.C.*, Case No. 2:10-cv- 3354-SLB, 2012 WL 4329288, *5 (N.D. Ala. Sept. 17, 2012) (granting the plaintiff's motion to strike the declaration of an undisclosed witness submitted by the defendant in support of a motion for summary judgment, where the plaintiff had "no opportunity to depose [the witness] within the time allowed by the court's scheduling order."). Accordingly, the Court finds that Kretzschmar's failure to identify Anita White, Kimmie Harris, and Luther Danzy as potential witnesses was neither justified nor harmless and will grant Birmingham East's motion to strike their affidavits. The Court will not consider the affidavits in ruling on Birmingham East's motion for summary judgment.

**D.     The Affidavit of Letosha Van Buren**

Kretzschmar has also submitted the Affidavit of Letosha Van Buren, an African-American who was employed as a Staffing Assistant at Birmingham East. (Doc. 47-4). It is unclear when she worked at Birmingham East or how long she worked there. In her affidavit, Van Buren primarily discusses her interactions with Amanda Gillott, a Caucasian nurse at Birmingham East.[9] She also offers comments on Birmingham East's treatment of Sandy Copeland and Leslee

---

[9] Although Van Buren was not disclosed as a witness in Kretzschmar's Rule 26 disclosures or her discovery responses, Kretzschmar described an alleged incident involving Van Buren and Gillott during her deposition. (Kretzschmar Dep. at 97-100).

Watkins, two former Caucasian employees who held the positions of Director of Nursing Services ("DON" or "DNS") and Assistant Director of Nursing ("ADON" or "ADNS") at Birmingham East.[10]

Birmingham East has moved the Court to strike a number of statements from Van Buren's affidavit. (Doc. 51 at 9-11). First, Birmingham East has moved the Court to strike the following statement from the second paragraph of Van Buren's affidavit: "I aver that the issues that includes [sic]: discrimination, creating a hostile work environment, intimidation, and the list goes on; happened at Birmingham Nursing and Rehab Center East when I was employed." (Van Buren Aff. at ¶ 2). The Court agrees with Birmingham East that this statement expresses improper legal conclusions and is due to be stricken. *See Hinson v. Chelsea Indus.*, 542 F. Supp. 2d 1236, 1242-43 (M.D. Ala. 2008) (striking paragraph of plaintiff's affidavit because it was "conclusory and state[d] an impermissible legal conclusion which invade[d] the province of the court").

Second, Birmingham East has moved the Court to strike Van Buren's statement in the second paragraph of her affidavit that Amanda Gillott worked at Birmingham East "after being fired from another facility and having her nursing license suspended." (Van Buren Aff. at ¶ 2). Birmingham East argues that this

---

[10] In the parties' submissions, Copeland's first name is also spelled "Sandi" and Watkins's first name is also spelled "Leslie." For consistency's sake, the Court will use "Sandy" and "Leslee" in this opinion.

statement should be stricken because Van Buren has not explained how she acquired knowledge about Gillott's previous employment history and licensure status and because the statement is irrelevant. (Doc. 51 at 10). Although Birmingham East is correct that Van Buren does not explain how she acquired this knowledge, she does state that the facts in her affidavit are true based upon her "personal knowledge and belief" (Van Buren Aff. at ¶ 1), which satisfies the requirement that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge …." FED. R. CIV. P. 56(c)(4). However, the Court agrees with Birmingham East that information about Gillott's employment history and licensure status prior to being hired by Birmingham East is irrelevant. The information has no relevance to any of Kretzschmar's claims in this action, which concern how Kretzschmar was allegedly treated at Birmingham East. Accordingly, Van Buren's statement that Gillott worked at Birmingham East after being fired from another facility and having her nursing license suspended will be stricken.

Third, Birmingham East has moved to strike statements in the second and sixth paragraphs of Van Buren's affidavit regarding discipline Amanda Gillott received while working at Birmingham East.[11] Birmingham East argues that Van Buren, who was not in a position of management at the facility, would have no

---

[11] Birmingham East mistakenly refers to the sixth paragraph of Van Buren's affidavit as paragraph 7. (Doc. 51 at 10).

personal knowledge of any discipline Gillott received and that her affidavit fails to establish the basis of any such personal knowledge. (Doc. 51 at 10). However, as noted above, Van Buren has represented that the facts set forth in her affidavit are true based upon her personal knowledge and belief. Given that representation, Van Buren's statements regarding the discipline Gillott received at Birmingham East will not be stricken in the absence of some affirmative evidence that she could not have had any personal knowledge of such discipline, which Birmingham East has not shown.

Fourth, Van Buren's affidavit includes the following statement regarding the announcement that Leslee Watkins was "stepping down" as Birmingham East's DON and taking the position of ADON: "How convenient considering Sandy Copeland had just regained her nursing license." (Van Buren Aff. at ¶ 6). Birmingham East asserts that this statement is due to be stricken, and the Court agrees. The statement is reflective of nothing more than Van Buren's inadmissible (and sarcastic) opinion.

Finally, Birmingham East has moved to strike the entire fourth paragraph of Van Buren's affidavit, in which Van Buren states as follows:

> (The "DON", "ADON", and Amanda Gillott are all Caucasians.) Leslee Watkins was new at the time and was being trained by Sandy Copeland (while her license were [sic] suspended) and our Executive Director, Melody Burch (also Caucasian) wanted her good friend Sandy Copeland to keep her job. Everyone knew including Leslee that the only reason they hired Leslee Watkins as the

> "DON" was because the DON has to have an active nursing license.
> They (Melody Burch and Sandy Copeland) had no intention to ever
> train Leslee, they only wanted to use her license until Sandy regained
> hers.  Once Sandy Copeland regained her license Leslee would step
> down as DON to the role of ADON.

(Van Buren Aff. at ¶ 4).  Except for Van Buren's statements that the DON, ADON,

Amanda Gillott, and Melody Burch are Caucasian, all of the above statements are

speculative and cannot be based on Van Buren's personal knowledge.  In

particular, Van Buren is in no position to testify to what "everyone knew" about

the hiring of Leslee Watkins or to what Melody Burch intended when she hired

Watkins.  To that extent the fourth paragraph of Van Buren's affidavit will be

stricken.

## II.  MOTION FOR SUMMARY JUDGMENT

**A.      Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  In other words, summary judgment is proper "after adequate time

for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 22.

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment."

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*)

(quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in

favor of the non-moving party are not unqualified, however.  "[A]n inference is not

reasonable if it is only a guess or a possibility, for such an inference is not based on

the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks*

*Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).

Moreover,

> [t]he mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is *material* to an issue
> affecting the outcome of the case.  The relevant rules of substantive
> law dictate the materiality of a disputed fact.  A genuine issue of
> material fact does not exist unless there is sufficient evidence favoring
> the nonmoving party for a reasonable jury to return a verdict in its
> favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and

alteration supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-

52 (1986) (asking "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").

**B.     Facts[12]**

**1.     Kretzschmar's Hiring**

Birmingham East is a long-term care nursing facility in Birmingham,

Alabama.  At all relevant times, Melody Burch was Birmingham East's Executive

Director. (Declaration of Melody Burch (Doc. 43-5) at ¶¶ 1-2).

In July 2012, Burch hired Kretzschmar as the temporary Social Services

Director at Birmingham East. (*Id.* at ¶ 6).  Kretzschmar had obtained her

Registered Nurse ("RN") license two months earlier. (Kretzschmar Dep. at 30).

After Birmingham East's regular Social Services Director returned to work, Burch

placed Kretzschmar in the position of MDS (Minimum Data Set) Coordinator.

MDS Coordinator is a nursing position that involves conducting clinical

assessments of facility residents as part of the development of a plan of care for

each resident.  The position does not involve supervisory duties. (Burch Decl. at ¶

6).

**2.     Kretzschmar's Appointment to Interim DON**

In January 2012 (prior to Kretzschmar's hiring), Burch hired Sandy

Copeland, a Caucasian, as a Quality Assurance Nurse at Birmingham East.

According to Burch, her intention when she hired Copeland was ultimately to

---

[12] These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

make her the facility's DON. However, because Copeland was on probationary status with the Alabama Board of Nursing and was restricted from supervising other employees at that time, Burch was prevented from hiring her as the DON. Consequently, in March 2012 Burch promoted Leslee Watkins, an RN she had hired the prior month, to DON. Watkins, a Caucasian, had approximately one year of nursing experience at the time of her hiring. Burch also understood that Watkins had experience managing subordinates. Burch contends that Watkins's promotion to DON was not an "interim" promotion, even though Burch still intended to ultimately place Copeland in the DON position if she successfully completed the requirements of her probation. (Burch Decl. at ¶¶ 4-5).

In the summer of 2012, the restrictions of Copeland's probation were lifted. Burch then promoted her to DON and re-assigned Watkins to the position of ADON. (*Id.* at ¶¶ 4-5).

The following year, in early June 2013, Burch learned that Copeland was not following Birmingham East's established procedures for securing narcotics. Upon investigation, Burch uncovered evidence that Copeland may have been responsible for the theft of narcotics from the facility's narcotics destruction cabinet. Burch also discovered that Watkins, like Copeland, was not following Birmingham East's procedures for securing narcotics. However, she did not uncover any evidence that Watkins was stealing narcotics. (*Id.* at ¶ 7).

On June 13, 2013, Burch terminated Copeland's employment as DON. Around this same time, Watkins resigned as ADON. Birmingham East policy requires professional personnel, including nurses, to give four weeks' notice of resignation and to work all scheduled days during the notice period in order to receive payment for unused vacation and personal time. Because Burch believed that Copeland had taken advantage of Watkins, Burch agreed to pay Watkins for her unused vacation and personal time, even though Watkins had not given four weeks' notice prior to her resignation. (*Id.* at ¶ 8).

According to Burch, Birmingham East did not have any remaining nurses on staff with sufficient experience to be promoted to DON, which meant that she needed to hire an outside candidate to fill the position. However, controlling federal regulations required Birmingham East to have a DON on staff at all times. Under these circumstances, Burch decided to make Kretzschmar the Interim DON, with an increase in pay, until a permanent DON was hired. (*Id.* at ¶ 9).

Exactly what Kretzschmar was told when she was appointed Interim DON is in dispute. According to Burch, she told Kretzschmar that once a permanent DON was hired, she would consider Kretzschmar for the ADON position if Kretzschmar demonstrated that she was capable of handling the job. Burch maintains that she never promised to make Kretzschmar the ADON, but only to consider her for the position. (*Id.*)

Kretzschmar does not dispute that Burch appointed her to the DON position on an interim basis. According to Kretzschmar, however, Burch promised to make her the ADON once a permanent DON was hired. (Kretzschmar Dep. at 79-81, 121-22). Kretzschmar insists that Burch promised to make her the ADON and did not tell her that she would simply be "considered" for the position based on her performance. (*Id.* at 110). According to Kretzschmar, she would not have accepted the Interim DON position had she been told that Burch might later change her mind and not make her the ADON. (*Id.* at 111-12).

### 3. Burch's Decision to Return Kretzschmar to MDS Coordinator

Kretzschmar began serving in the Interim DON position on June 13, 2013. (Burch Decl. at ¶ 11). The following month, during the week of July 8, 2013, Burch hired Malea Braxton as Birmingham East's permanent DON. Braxton's first day of work as DON was July 15, 2013. (Burch Decl. at ¶ 11).

During the month that Kretzschmar served in the Interim DON position, Burch observed her job performance and received feedback on her performance from other employees. According to Burch, she noted issues with Kretzschmar's "maturity, professionalism, judgment, leadership and responsibility." (*Id.* at ¶ 11). In particular, Burch observed:

> (a) during daily management meetings with all department heads and others, Ms. Kretzschmar would regularly cut up, joke, make inappropriate comments, and generally act in an immature manner; (b) on one occasion, as a joke, she took the penis from an anatomically

correct mannequin used for training purposes and left it in another employee's desk chair; (c) on another occasion in front of me and other employees, she took a "butt pad" out of her pants and swung it around and made comments about how her "booty" looked better padded; (d) during this time period I learned that she had a brief consensual sexual affair with the Human Resources Representative; [and] (e) several nursing department employees told me that when they had work issues at night or on weekends and needed to speak with Ms. Kretzschmar, she would not answer or return calls (which resulted in them calling me [Burch] for the needed assistance).

(*Id.*)  Based on these observations, Burch determined that Kretzschmar was not ready to fill the position of ADON.  Consequently, when Burch hired Malea Braxton as the permanent DON, Burch decided to return Kretzschmar to her former position as MDS Coordinator and not make her the ADON. (Burch Decl. at ¶ 11).

Kretzschmar does not expressly deny any of Burch's observations regarding her job performance as Interim DON, but does allege some additional facts.  With respect to her behavior during management meetings, Kretzschmar cites the affidavit testimony of Leslee Watkins, who served as Birmingham East's DON and then ADON when Kretzschmar was first employed as MDS Coordinator. (Doc. 47-2).  According to Watkins, Birmingham East held daily management meetings during her tenure at the facility and there were "personal conversations that occurred regarding plastic surgery, breast implants and butt pads." (*Id.*)  She asserts that "[t]he conversations were not just between Kendralia Kretzschmar and myself, others were present and spoke freely regarding their thoughts, opinions and

personal inquiries regarding personal desires, likes and dislikes regarding the above mention[ed] topic[s]." (*Id.*)

With respect to Burch's observation that Kretzschmar had a brief consensual affair with the Human Resources Representative, Kretzschmar asserts that "[a]t the time [she] dated the co-worker she was not interim DNS and/or the ADNS. She was the MDS Coordinator and it was prior to [her] promotion [to Interim DNS] and Burch was aware of this before the promotion."[13] (Doc. 47 at 21 n.6).

With respect to Burch's assertion that nursing department employees would call her at night and on weekends when they needed assistance because Kretzschmar would not answer or return their calls, Kretzschmar retorts that Burch "posted flyers throughout the facility instruct[ing] nurses to call Burch." (Doc. 47 at 4). It is apparent from Kretzschmar's deposition testimony that the flyers were posted after Malea Braxton was hired as the permanent DON at the facility, as it was Kretzschmar's "perception" that she was no longer the Interim DON when the flyers were posted. (Kretzschmar Dep. at 139-41). Before then, employees had been directed to call Kretzschmar if they had any nursing issues. (*Id.* at 141).

---

[13] The Court notes that Kretzschmar has offered no evidentiary support for her assertion that Burch was aware of her affair prior to promoting her to Interim DON, and merely cites her own deposition testimony that the affair was "brief." (Kretzschmar Dep. at 314-15).

### 4. Kretzschmar's Personal Items

On July 12, 2013, the Friday before Malea Braxton was scheduled to begin work as Birmingham East's permanent DON, Burch and Charlotte Nelson, a nurse consultant, removed a number of Kretzschmar's personal items from the DON office in preparation for Braxton's arrival. They packed the items in a box and put the box in the MDS Coordinator's office. No other employees assisted them. Because Kretzschmar was out sick that day, she was not present to remove the items herself. (Burch Decl. at ¶ 13; Kretzschmar Dep. at 152).

### 5. Kretzschmar's Text Messages to Amanda Gillott

On Saturday afternoon, July 13, 2013, Kretzschmar sent the following text message to Amanda Gillott, a Caucasian who was employed as a Licensed Practical Nurse ("LPN") at Birmingham East: "Amanda I just wanted you to know that I thought you were a kind person and I thought very highly of you but just like the others your time will come too." (Doc. 43-5 at 15). Gillott responded: "I have no idea what you are talking about Shay [Kretzschmar]." (*Id.* at 16). Kretzschmar replied: "Sure you don't. You are just like leslie and sandy a back stabber. I don't understand what you people get out of trying to hurt other people and stab them in the back. Just remember what goes around comes around." (*Id.* at 17).

On Monday, July 15, 2013, Gillott showed Burch the text messages she had received from Kretzschmar on Saturday. Gillott characterized the text messages as

threatening and racially derogatory and complained that they created a "hostile work environment." After reviewing the text messages, Burch met with Kretzschmar, who confirmed that she had sent the texts to Gillott. Kretzschmar told Burch she sent the text messages to Gillott after Shaunnan Cook, another Birmingham East employee, told her that Gillott had said she (Kretzschmar) would not make a good DON or ADON and that Gillott would not work for her. Kretzschmar said that Cook had warned her not to trust Gillott because Gillott was not really her friend. Kretzschmar told Burch that she sent the text messages to Gillott to let her know that she was a "snake in the grass." (Burch Decl. at ¶ 14). At her deposition, Kretzschmar denied that her reference to "you people" in her second text message to Gillott had anything to do with race. She stated that it was just a reference to how she had been treated by Gillott, Leslee Watkins, and Sandy Copeland. Kretzschmar also confirmed that the statements Cook attributed to Gillott were hearsay and that Gillott did not make any of the statements directly to her face. (Kretzschmar Dep. at 156-60).

### 6. Kretzschmar's Suspension

During her meeting with Kretzschmar on July 15, 2013, Burch informed Kretzschmar that she was going to investigate Gillott's complaint. Burch also informed Kretzschmar that she did not believe Kretzschmar was ready to assume the ADON position and was going to return Kretzschmar to her former position as

MDS Coordinator at her former rate of pay. (Burch Decl. at ¶ 14; Kretzschmar Dep. at 183). According to Burch, she had already decided not to promote Kretzschmar to ADON before Gillott complained about Kretzschmar's text messages. However, Kretzschmar's actions in sending the texts "confirmed [and] provided additional grounds" for the decision. (Burch Decl. at ¶ 14). According to Burch, "[e]ven if Ms. Gillott made the statements as alleged by Ms. Cook, it was simply not appropriate for Ms. Kretzschmar, as the Interim [DON], to send threatening text messages to a subordinate." (*Id.*)

Burch investigated the matter further but was unable to verify that Gillott had made the statements Shaunnan Cook attributed to her. On July 18, 2013, Burch again met with Kretzschmar and gave her a counseling memorandum that summarized their prior meeting on July 15 and reiterated that Burch did not feel Kretzschmar was ready to assume the ADON position. (Burch Decl. at ¶ 15; Doc. 43-4 at 26). Burch also stated in the memorandum that Kretzschmar was "creating racial tension in the facility." (Doc. 43-4 at 26). Burch also noted that Kretzschmar had asked the Human Resources Director whether she would get to stay at the rate of pay she had been receiving as Interim DON, and that Kretzschmar had made "threatening comments that she had an attorney and was suing [Birmingham East] for discrimination" when the Human Resources Director informed her that she

would return to her MDS Coordinator pay rate. (*Id.*).  Kretzschmar signed the counseling memorandum. (*Id.*)

The next day, July 19, 2013, Kretzschmar sent Burch a follow-up email. (Doc. 43-5 at 19).  She denied creating any "racial division" at Birmingham East. (*Id.*)  She accused Gillott of antagonizing her and stated that she felt she was working in a "hostile working environment." (*Id.*)  She also stated that she was "upset" and "under duress" when she signed the counseling memorandum and did not know what she had signed. (*Id.*)

Burch forwarded Kretzschmar's email to Crystal Robinson, the Regional Human Resources consultant to Birmingham East, and then contacted Robinson to discuss the matter.[14]  Robinson, an African-American, advised Burch that all of the allegations in the email could violate Birmingham East's harassment policy.  She recommended that Burch reopen her investigation to ensure she had all the facts. Robinson and Burch also discussed suspending the three employees involved in the underlying incident—Kretzschmar, Gillott, and Cook.   Burch agreed with Robinson's recommendations, reopened her investigation, and suspended Kretzschmar, Gillott, and Cook on July 22, 2013. (Burch Decl. at ¶ 16).

---

[14] Robinson worked for an administrative services company that provides consulting services to Birmingham East.  She was not a member of Birmingham East's management. (Burch Decl. at ¶ 16).

According to Burch, she was unable to uncover any evidence that Kretzschmar was being subjected to a hostile work environment or was being antagonized by Gillott. She also was unable to find any evidence corroborating Cook's allegations—which Gillott denied—that Gillott had stated that Kretzschmar would not be a good DON or ADON and that Gillott would not work for her. Burch was able to confirm that Cook had told Kretzschmar not to trust Gillott and that Gillott was not her friend, as Cook admitted making those statements to Kretzschmar. (Burch Decl. at ¶ 17).

According to Burch, the results of her reopened investigation confirmed that Kretzschmar was guilty of inappropriate behavior (sending the text messages to Gillott), Cook was guilty of gossiping, and Gillott was not guilty any wrongdoing. Burch determined that Kretzschmar's behavior was the most serious, because she was the Interim DON when the incident occurred.[15] (Burch Decl. at ¶ 18). Based on her findings, Burch returned Gillott and Cook to work after three days and returned Kretzschmar to work after five days. Burch paid Gillott for the days she was suspended, but did not pay Cook or Kretzschmar. (Burch Decl. at ¶ 18).

---

[15] Kretzschmar testified at her deposition that it was her "perception" that she was no longer serving in the Interim DON position when she sent the text messages. (Kretzschmar Dep. at 141).

### 7.    Kretzschmar's Medication Error

On Saturday, July 20, 2013, prior to Kretzschmar's suspension, Burch instructed several nurses, including Kretzschmar and Marilyn Caudle (a Caucasian who, like Kretzschmar, worked as an MDS Coordinator), to work a shift administering medications to residents, due to several charge nurses having called off that day.  According to Burch, all RNs and LPNs at Birmingham East are required to work such shifts when needed.  During her shift, Kretzschmar made a medication error.  Kretzschmar indicated on a resident's Medication Administration Record ("MAR") that she had given the resident a narcotic mediation when she had not done so.  Instead, Kretzschmar left the medication unsecured on the medication cart.  Caudle, who relieved Kretzschmar, found the unsecured medication and notified Burch. (Burch Decl. at ¶¶ 19 & 21).

Kretzschmar does not deny leaving the medication on the cart.  According to Kretzschmar, she had "very little" experience working on the medication cart because she was an RN supervisor and working on the medication cart was "mostly" an LPN duty. (Kretzschmar Dep. at 212).  Kretzschmar asserts that she signed the resident's MAR when she "pull[ed]" the medication, but was unable to administer the medication because the resident was asleep. (*Id.* at 209-10).

Kretzschmar left the medication on the cart intending to "bring [it] back later."[16]
(*Id.* at 210). She also had to assist another patient who had fallen, which took her
attention away from the medication she left on the cart. (*Id.* at 218).

Burch determined that Kretzschmar was guilty of improperly completing the
MAR and failing to properly dispose of the narcotic medication. On July 29,
2013, after Kretzschmar returned from her suspension, Burch issued her an
Employee Corrective Counseling Form, a form of discipline that did not affect
Kretzschmar's salary or job status. According to Burch, she has disciplined "many
other" nurses at Birmingham East, including Caucasian nurses, for similar
medication errors. (Burch Decl. at ¶ 21).

### 8.    Kretzschmar's Request for Vacation

In August 2013, Kretzschmar put in a request for vacation. (Burch Decl. at
¶ 23; Kretzschmar Dep. at 249-50). There is a dispute as to whether her request
was approved unconditionally. According to Kretzschmar, Burch agreed to her
vacation and "signed the papers to say that [the] vacation was approved."[17]
(Kretzschmar at 251). Burch, on the other hand, maintains that she approved
Kretzschmar's vacation request provided that her MDS assessments were

---

[16] Although Kretzschmar initially admitted that she left the medication on the cart, she later
testified that she "[did]n't really recall leaving the medication on the cart." (Kretzschmar Dep. at
221-22). She did not, however, deny that the incident occurred.

[17] Kretzschmar testified that she did not keep a copy of the "papers" Burch allegedly signed
approving her vacation, and no such papers appear in the record. (Kretzschmar Dep. at 251).

completed. (Burch Decl. at ¶ 23). Birmingham East's payroll records reflect that Kretzschmar took two vacation days in August 2013 and was paid for both days. (*Id.*; Doc. 43-5 at 46-49). Kretzschmar does not recall taking any vacation that month and contends that Burch cancelled her vacation because her assessments were behind. (Kretzschmar Dep. at 251, 253-54).

### 9. Kretzschmar's EEOC Charge

On August 28, 2013, Kretzschmar filed a charge of discrimination with the EEOC against Birmingham East. In her EEOC Charge, Kretzschmar checked the box for discrimination based on "race" and stated as follows:

> I am a Black female. I was hired as the MDS Coordinator for the above named employer in July of 2012. I performed my job in an exemplary manner. In June of 2013, I was asked to perform the duties of interim Director of Nursing until a permanent replacement was found for the previous Director of Nursing. I was told that once the permanent position was filled, I would be placed in the position of Assistant Director of Nursing. I moved into the office and began performing the duties as the Director of Nursing. In or about July of 2013, I received an unfavorable text message from a co-worker concerning my placement in the interim position. I responded to the text message; however, my response was not received as I intended. I was told by the Executive Director, Melody Burch that I was creating a racially hostile work environment and I was being suspended pending an investigation. Prior to my suspension, my personal belongings were moved from my office without any regard to their importance. When I returned to work, I was placed in the position that I originally occupied and my pay was reduced. I am aware that Amanda Galliot [sic], White, was suspended for making racially motivated statements and unlike me, received a promotion after she returned to work.

I believe that I have been discriminated against and subjected to different terms and conditions because of my race, Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1-2 at 3).

### 10. Kretzschmar's Resignation/Termination

On September 8, 2013, Kretzschmar sent an email to Burch with the subject line "prn effective[ ] immediately." (Burch Decl. at ¶ 24; Doc. 43-5 at 51). In the email, Kretzschmar informed Burch that she no longer wanted to work full time at Birmingham East and only wanted to work "prn" (as needed) at that time. (Doc. 43-5 at 51). She further stated that due to the "short notice" she was "willing to come in a few days a week until you find someone to replace me." (*Id.*) Burch interpreted Kretzschmar's email as a resignation and by email dated September 9, 2013, notified Kretzschmar that she accepted the resignation "effective immediately." (Burch Decl. at ¶ 24; Doc. 43-5 at 51). According to Burch, Birmingham East does not allow employees "to simply announce that they are changing their employment status from full time to some sort of permanent 'PRN' status" and Birmingham East did not have any need for an MDS Coordinator who worked on only a PRN basis. (Burch Decl. at ¶ 24). When Burch advised Kretzschmar that she was accepting her resignation, Burch was unaware that Kretzschmar had filed an EEOC Charge against Birmingham East. (*Id.* at ¶ 26).

Kretzschmar denies that she resigned and points out that she did not use the word "resign" in her email to Burch. (Doc. 47 at 12). Kretzschmar contends that she was "forced out" after she advised Burch that she wanted to go PRN. (Kretzschmar Dep. at 285). She admits that MDS Coordinator is a full-time position, but contends that she was denied the opportunity to work on a PRN basis until a permanent replacement was hired. (*Id.* at 287).

Kretzschmar did not receive a payout of her unused personal and vacation time. According to Burch, Kretzschmar was not entitled to such a payout because she did not give four weeks advance notice prior to her resignation and did not work all of the days she was scheduled to work during the notice period. (Burch Decl. at ¶ 25).

## 11. Birmingham East's Hiring of a New ADON

After Burch hired Malea Braxton as Birmingham East's permanent DON and returned Kretzschmar to her MDS Coordinator position in July 2013, Burch decided not to fill the vacant ADON position at that time. According to Burch, Braxton informed her that she was not sure she would need an ADON, as she had previously worked as a DON at larger long-term care facilities without the assistance of an ADON. Burch told Braxton that she would let Braxton determine whether she needed or wanted to hire an ADON in the future. (Burch Decl. at ¶ 22).

In October 2013, after Kretzschmar no longer worked at Birmingham East, Braxton advised Burch that she wanted to make Dakota Cheatham, an RN at the facility, the ADON. (Burch Decl. at ¶ 27).  Cheatham is Caucasian. (Kretzschmar Dep. at 227).  At that time, Cheatham was serving in a Unit Manager position, having been placed in that position by Braxton in August 2013.  According to Burch, Braxton, as the DON, was responsible for making hiring and promotion decisions with respect to Unit Managers.  When Braxton told Burch that she wanted to make Cheatham the ADON in October 2013, Burch informed Braxton that she could make that decision on her own, without Burch's input.  Braxton then appointed Cheatham to the ADON position. (Burch Decl. at ¶¶ 27-28).

## C.    Analysis

As noted, the Court's ruling on Birmingham East's motion to dismiss allowed Kretzschmar to pursue (1) her claims under Title VII and Section 1981 alleging race discrimination as to her "suspension, demotion, and pay reduction" in July 2013; (2) her claims under Title VII and Section 1981 alleging retaliatory discharge; (3) her claim under Section 1981 for alleged retaliatory acts other than discharge; and (4) her claim under Section 1981 alleging a hostile work environment.  Birmingham East has moved for summary judgment on each of these claims.

### 1. Kretzschmar's Hostile Work Environment Claim

As an initial matter, the Court notes that Kretzschmar has not addressed or otherwise opposed Birmingham East's motion for summary judgment on her hostile work environment claim. She argues in her response to the motion for summary judgment that the motion is due to be denied as to her "racial discrimination claims" and her "claims of retaliation," but she offers no argument with respect to her hostile work environment claim, which is not even mentioned anywhere in her response. (Doc. 47 at 15-20). Accordingly, Kretzschmar has effectively conceded her hostile work environment claim and the claim is subject to dismissal. *See Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n.2 (11th Cir. 2009) (claim waived where not addressed by plaintiff in response to defendant's motion for summary judgment); *Childress v. Walker*, 943 F. Supp. 2d 1332, 1349 (M.D. Ala. 2013) (claim conceded when plaintiff "failed to meaningfully address it in response to Defendants' summary judgment motion"); *cf. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *McMaster v. United States,* 177 F.3d 936, 940–41 (11th Cir. 1999) (noting that a claim may be considered abandoned when the allegation is included

in the plaintiff's complaint but he fails to present any argument concerning the claim to the district court).

### 2. Kretzschmar's Race Discrimination Claims

### a. The Applicable Legal Framework

Kretzschmar's race discrimination claims are based on two separate employment actions: (1) Birmingham East's failure to make her the facility's permanent ADON in July 2013 and (2) her suspension without pay later that same month. Because Kretzschmar relies on circumstantial evidence to prove her claims, they are evaluated under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981):

> Under this framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997). A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class. *See, e.g., McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824; *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984).

When the plaintiff establishes a prima facie case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas,* 285 F.3d at 1342; *Combs,* 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254-55, 101 S. Ct. at 1094. If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. *Id.* at 255-26, 101 S. Ct. at 1094-95.

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Using that framework, the Court will first address Kretzschmar's claim regarding Burch's failure to make her the facility's ADON, and will then consider her suspension claim.

### b. Kretzschmar's Demotion/Promotion Denial Claim

Kretzschmar alleges that Birmingham East discriminated against her based on her race when Burch failed to make her the facility's permanent ADON after hiring Malea Braxton as the new DON in July 2013. Kretzschmar characterizes Burch's decision not to make her the ADON and to return her to her MDS Coordinator position as a "demotion," while Birmingham East characterizes the decision as a "promotion denial." The parties' semantic disagreement centers on whether Kretzschmar was actually promoted to ADON when she was asked to assume the position of Interim DON in June 2013. Kretzschmar argues that "on

June 13, 2013 [she] was promoted to Assistant Director of Nursing … and at the same time was asked to perform duties as the Interim Director of Nursing until that spot was filled." (Doc. 47 at 2). She thus contends that Burch "demoted" her when Burch returned her to her MDS Coordinator position after hiring Braxton as the new DON. (*Id.* at 3, 18). Birmingham East, on the other hand, asserts that Burch "temporarily promoted [Kretzschmar] to Interim Director of Nursing Services … in June 2013 from her position as MDS Coordinator, and allegedly promised to make her ADNS after a permanent DNS was hired."[18] (Doc. 50 at 2 n.2). Birmingham East contends that "Burch's failure ultimately to make [Kretzschmar] the ADNS was a denied promotion, not a demotion." (*Id.*)

The Court agrees with Birmingham East that Burch's failure to make Kretzschmar the permanent ADON is more accurately characterized as a "promotion denial" than a "demotion." Kretzschmar testified at her deposition that when Burch asked her to serve as the Interim DON, Burch "said she felt like I was qualified to do the interim director position, to fill in until she found a more qualified individual. And at that time I would be her assistant, the assistant to the director of nursing …." (Kretzschmar Dep. at 80). She further testified that

---

[18] As previously noted, Burch denies that she promised to make Kretzschmar the permanent ADNS and asserts that she only agreed to consider her for the position.

Burch "said that she would pay me at the level of the assistant director of nursing, the position that I would hold once the director of nursing was filled." (*Id.*) Similarly, Kretzschmar alleged in her EEOC Charge: "In June of 2013, I was asked to perform the duties of interim Director of Nursing until a permanent replacement was found for the previous Director of Nursing.  I was told that once the permanent position was filled, I would be placed in the position of Assistant Director of Nursing." (Doc. 1-2 at 3).  Contrary to Kretzschmar's current contention that she was promoted to ADON in June 2013, it is evident that Kretzschmar understood she would not become the ADON, and would not "hold" or be "placed in" that position, until Burch hired a permanent DON.  When Burch failed to make Kretzschmar the ADON after hiring Braxton as the permanent DON, she denied Kretzschmar a promotion she had allegedly been promised.  Burch did not demote Kretzschmar from the position of ADON, because Kretzschmar never held that position.  Accordingly, the Court will analyze Kretzschmar's claim as a discriminatory promotion denial (failure to promote) claim.[19]

---

[19] To the extent Kretzschmar also alleges a discriminatory pay reduction claim in her amended complaint, the claim is encompassed within her promotion denial claim.  Burch's decision not to promote Kretzschmar to ADON when her Interim DON appointment ended, and instead to return Kretzschmar to her MDS Coordinator position, resulted in a corresponding reduction in Kretzschmar's pay back to the rate she had been receiving as MDS Coordinator. (Burch Decl. at ¶ 14).  In other words, Kretzschmar's promotion denial claim subsumes any pay reduction claim. The Court also notes that Kretzschmar does not address or offer any argument in support of a discriminatory pay claim in her response to Birmingham East's motion for summary judgment.

## 1. Prima Facie Case

To establish a prima facie case of discriminatory failure to promote, a plaintiff must demonstrate that "(i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005) (footnote omitted) (citing *McDonnell Douglas*, 411 U.S. at 802).[20] Here, Birmingham East argues that Kretzschmar cannot meet the fourth prong of her prima facie case—namely, that the ADON position was filled by a person outside her protected class. Birmingham East asserts that because it is "undisputed [that] Burch and Braxton specifically decided not to fill [the ADON position] in July 2013," Kretzschmar cannot establish that the position was filled by someone outside her class and, consequently, "no inference of discrimination arises." (Doc. 42 at 12).

Kretzschmar argues that she has established a prima facie case of discrimination as to Burch's decision not to make her the ADON, asserting that she was "replaced" as ADON by Dakota Cheatham, a Caucasian. (Doc. 47 at 15-16).

[20] Even if Kretzschmar's claim were construed as a discriminatory demotion claim, her prima facie burden would be essentially the same. To establish a prima facie case of discriminatory demotion, a plaintiff must show "(1) that she was a member of a protected class, (2) that she was qualified for the job, (3) that she suffered an adverse employment action, and (4) that she was replaced by someone outside the protected class." *Hinson v. Clinch Ctny., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

Although the Court does not agree that Kretzschmar was "replaced" as ADON (as discussed above, Kretzschmar never held the ADON position), it is undisputed that the position of ADON was ultimately filled by Cheatham, a person outside Kretzschmar's protected class.

Birmingham East argues that the promotion of Cheatham to ADON does not establish the fourth prong of Kretzschmar's prima facie case for two reasons. First, Birmingham East argues that the decision to promote Cheatham to ADON was made by Malea Braxton (the new DON), not by Burch. Birmingham East asserts that this "difference in decision makers" prevents Kretzschmar from establishing her prima facie case. (Doc. 42 at 13) (citing *Silvera v. Orange Ctny. Sch. Bd.*, 244 F.3d 1253, 1261 n.1 (11th Cir. 2001) (observing that "difference in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination")). The Court does not agree. It is undisputed that Braxton informed Burch that she wanted to make Cheatham the ADON in October 2013 and that Burch allowed Braxton to make that decision. (Burch Decl. at ¶ 27). Although Burch asserts that she had no input into Braxton's decision, she was on notice of what Braxton intended to do and at least tacitly approved the decision. For summary judgment purposes, the Court finds that Burch had sufficient involvement in the decision to promote Cheatham to ADON to make her a

decision-maker with respect to Cheatham's promotion, even if she was not the primary decision-maker.

Birmingham East also argues that the "three month time lapse" between the time Burch decided not to promote Kretzschmar to ADON (July 2013) and the time Cheatham was promoted to ADON (October 2013) prevents Kretzschmar from establishing her prima facie case. (Doc. 42 at 12). The Court agrees with Birmingham East. "In a failure to promote case, the plaintiff must show 'that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied.'" *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1179 (11th Cir. 2010) (emphasis omitted) (quoting *Chapell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006); *see also Guimares v. NORS*, 2009 WL 1098092, *5 (S.D. Fla. 2009) (plaintiff failed to establish a prima facie case of failure to promote where "there were no openings for, or employees promoted to, a position of supervisor during the period when Plaintiff sought a promotion" and "no supervisory position was filled until more than six months after Plaintiff's termination"). Here, no employee was promoted to the position of ADON from mid-July to mid-October 2013. Kretzschmar has not challenged Burch's assertion that she did not fill the position during this period because Braxton, the new ADON, had not decided whether she needed an ADON. (Burch Decl. at ¶ 22). Moreover, by the time Cheatham was

appointed to the position in October, Kretzschmar no longer worked at Birmingham East, Kretzschmar having informed Burch in September that she no longer desired to have full-time employment at the facility and Burch having accepted her "resignation." Under these circumstances, Kretzschmar has failed to meet her prima facie burden to show that the ADON position was filled by a person outside her protected class at the time her promotion was denied.

## 2.    Pretext

Even assuming that Kretzschmar has established a prima facie case of discrimination with respect to Burch's decision not to promote her to ADON, Birmingham East has articulated a legitimate, non-discriminatory reason for the decision—Burch's determination that Kretzschmar was not ready to assume the position of ADON due to the lack of "maturity, professionalism, judgment, leadership and responsibility" that Kretzschmar displayed while serving as Interim DON, along with the text messages Kretzschmar sent to Amanda Gillott.[21] (Burch Decl. at ¶¶ 11, 14). Within this overarching reason, Birmingham East has pointed to Burch's observation that Kretzschmar exhibited inappropriate behavior during daily management meetings; Burch's discovery that Kretzschmar had been involved in a brief consensual sexual affair with the Human Resources

_____

[21] For brevity's sake, the Court will refer to Burch's concerns about Kretzschmar's "maturity, professionalism, judgment, leadership and responsibility" as "professionalism" concerns or concerns about Kretzschmar's "unprofessional" conduct.

Representative; Kretzschmar's failure to answer or return calls from nursing department employees who needed assistance at night and on weekends; and the "threatening" nature of the text messages Kretzschmar sent to Gillott. (*Id.*) These are legitimate, non-discriminatory reasons for not promoting Kretzschmar to ADON. *See Gamble v. Aramark Uniform Servs.*, 132 F. App'x 263, 266 (11th Cir. 2005) (even assuming the plaintiff established a prima facie case of discriminatory failure to promote, the defendant articulated legitimate non-discriminatory reasons for its decision: the plaintiff's "lack of interpersonal skills and the poor evaluation of his work performance rendered him the less suitable candidate.").

Birmingham East having articulated legitimate, non-discriminatory reasons for its decision, the burden shifts to Kretzschmar to come forward with evidence that the alleged reasons are a pretext for discrimination. *Wilson*, 376 F.3d at 1087. Kretzschmar must "produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000). In this regard:

> [The court does] not judge whether an employer's decisions are "prudent or fair," and the sole concern is whether unlawful discriminatory animus motivated an employment decision. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Furthermore, a reason is not pretextual "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). A plaintiff cannot show pretext

merely by showing that an employer's good faith belief that she engaged in misconduct is mistaken. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000).

*Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 811 (11th Cir. 2014).

Kretzschmar contends that all of Birmingham East's alleged reasons for denying her the ADON position are pretextual. As best as the Court can discern, Kretzschmar appears to be advancing a three-part pretext argument. First, Kretzschmar argues that the position statement Birmingham East submitted to the EEOC in response to her charge of discrimination discusses only the text messages she sent to Gillott and none of the other examples of alleged unprofessional conduct cited by Burch in her Declaration, which indicates that Burch "created" those other reasons after the fact. (Doc. 47 at 13-14, 15). Second, Kretzschmar argues that the text messages could not have been the true reason Burch decided not to promote her to ADON, because she sent the text messages to Gillott on July 13, 2013, two days after Burch informed her that she was not going to be promoted to ADON. (*Id.* at 5, 9, 15). Third, Kretzschmar offers explanations for each of the alleged acts of unprofessional conduct cited by Burch, asserting that "there is no real reason" Burch did not promote her other than her race. (*Id.* at 14-15). Burch thus argues that she has met her pretext burden. The Court does not agree.

The fact that Birmingham East's position statement discusses only the text messages Kretzschmar sent to Gillott is insufficient to establish pretext. Evidence

that an employer has additional reasons for a challenged employment decision beyond those asserted in its position statement does not show pretext unless the reasons are inconsistent. *See Vickers v. Hyundai Motors Mfg. Alabama, LLC*, 648 F. App'x 751, 754 (11th Cir. 2016) ("the existence of multiple non-retaliatory or nondiscriminatory reasons for the employer's action does not show pretext, especially where those reasons are not inconsistent"); *Moore v. Jefferson Cnty. Dep't of Human Res.*, 277 F. App'x 857, 859-60 (11th Cir. 2008) (finding employer's differing reasons for challenged action between its position statement and deposition testimony did not establish pretext where the reasons were not inconsistent). Here, Burch's overarching reason for not promoting Kretzschmar— her concerns about Kretzschmar's professionalism—is consistent with Birmingham East's position statement. Indeed, Birmingham East expressly stated in its position statement that Burch found Kretzschmar's actions in sending the text messages to Gillott to be "unwarranted, unprofessional and highly inappropriate." (Doc. 47-11 at 4). Birmingham East also stated in the position statement that when Burch informed Kretzschmar that she did not believe Kretzschmar was ready to be ADON, Burch "encouraged her to continue working on improving her professional skills so that she would be prepared when opportunities arose in the future." (*Id.*) Professionalism concerns are reflected in both Birmingham East's position statement and Burch's Declaration.

Kretzschmar's argument that the text messages she sent to Gillott could not have been the true reason Burch decided not to promote her to ADON also misses the mark. Even assuming that Burch informed Kretzschmar that she was not going to be promoted to ADON two days before Kretzschmar sent the offending texts to Gillott (Burch contends that she advised Kretzschmar of her decision two days after Kretzschmar sent the texts), Burch does not contend that the text messages were the precipitating factor in her decision. Rather, Burch asserts that the text messages, and Kretzschmar's handling of the allegations made by Shaunnan Cook about Gillott, "not only confirmed but provided additional grounds" for her decision, which she admits she made before she learned about the text messages. (Burch Decl. at ¶ 14).

Kretzschmar's efforts to explain the instances of unprofessional conduct identified by Burch in her Declaration are also insufficient to establish pretext. With respect to Burch's observation regarding Kretzschmar's behavior at management meetings, Kretzschmar argues that "during the management meetings … she did not cut up, joke or make any inappropriate comments that no other department head or manager was making." (Doc. 47 at 14). Kretzschmar notes that Leslee Watkins, a Caucasian, "admits that they all participated in jovial conversation regarding butt pads and plastic surgery" but that Watkins, unlike Kretzschmar, "was placed in the ADNS position as promised once the permanent

DNS was hired." (*Id.* at 16).  Birmingham East responds that Watkins's employment at Birmingham East ended before Kretzschmar was appointed Interim DON and that Burch's decision not to promote Kretzschmar to ADON was based on her observations of Kretzschmar's behavior while serving as Interim DON. (Doc. 50 at 5-6).  Birmingham East also argues that the conduct admitted by Watkins—conversations about plastic surgery, breast implants, and butt pads—is "qualitatively different" than the conduct Kretzschmar engaged in while Interim DON, which included placing a mannequin's penis in a co-worker's chair and removing a butt pad from her pants and swinging it in the air. (*Id.* at 5).  Lastly, Birmingham East argues that there is no evidence Burch ever promised to make Watkins the ADNS and that even if she did, "such fact would not be evidence of pretext because there is no evidence that Watkins had issues with professionalism like Kretzschmar." (*Id.* at 12).

If Kretzschmar's behavior at management meetings were the sole example of Kretzschmar's unprofessional conduct cited by Burch, the Court might be inclined to find that Kretzschmar has made a sufficient showing of pretext. Although Birmingham East argues that comparing Kretzschmar to Watkins is an "apples to oranges" comparison, Burch admits that when she appointed Watkins to the position of "permanent" DON, her ultimate intention was to make Sandy Copeland the DON once her probation was lifted. (Burch Decl. at ¶ 5).  In other

words, barring Copeland's failure to successfully complete the terms of her probation, Burch intended for Watkins's tenure as DON to be temporary, just like Kretzschmar's. After Copeland's probation was lifted and she was promoted to DON, Burch moved Watkins to ADON notwithstanding Watkins's admitted participation in inappropriate conversations during management meetings. Regardless of whether Burch had promised Watkins the ADON position or not, she appointed Watkins ADON even though Watkins, while serving as DON, engaged in similar (although not identical) behavior as Kretzschmar. If Kretzschmar's conduct at management meetings was the only reason articulated by Burch for not promoting Kretzschmar, a reasonable factfinder could conclude that the proffered reason was a pretext for discrimination.

However, Kretzschmar's conduct at management meetings is not the only example of unprofessional conduct cited by Burch. Burch also cites Kretzschmar's admitted sexual affair with a co-worker, which Burch asserts she learned about during Kretzschmar's tenure as Interim DON. (Burch Decl. at ¶ 11). Kretzschmar contends that Burch was aware of the affair before promoting her to Interim DON (doc. 47 at 14), but has not provided any evidence in support of her contention. Burch also points to Kretzschmar's failure to answer or return calls from nursing department employees at night and on weekends when she was serving as Interim DON. Kretzschmar argues that Burch "fails to mention that Burch posted flyers

49

throughout the facility instruct[ing] instructing nurses to call [her]" rather than Kretzschmar (doc. 47 at 4), but Kretzschmar's own deposition testimony confirms that the flyers were not posted until after Burch had hired Malea Braxton as the new DON (i.e., during Kretzschmar's final week as Interim DON). (Kretzschmar Dep. at 139-41). Kretzschmar admitted at her deposition that before the flyers were posted, the nurses were directed to call her. (*Id.* at 141).

Moreover, nowhere in Kretzschmar's response does she directly rebut any of the reasons cited by Burch for finding her not ready to be ADON. Kretzschmar does not deny making inappropriate comments at daily management meetings, placing a mannequin's penis in a co-worker's chair, and removing a butt pad from her pants and swinging it in the air; she does not deny having a sexual affair with the Human Resources Representative; she does not deny failing to answer or return calls from nursing department employees at night and on weekends; and she does not deny sending the offending text messages to Gillott. She quarrels with Burch's reasons and offers excuses for her conduct, but never denies or rebuts any of the reasons. Quarreling with an employer's proffered reasons for its decision is insufficient to show pretext. *See Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with the reason is not sufficient." (citations omitted)).

Finally, Kretzschmar has not offered any evidence suggesting that Burch's real reason for not promoting her to ADON was racial discrimination. Kretzschmar argues that when Copeland was terminated as DNS and Watkins resigned as ADNS, Burch was "desperate" and "lied to Kretzschmar to get her to accept the Interim DNS position with a guarantee [that she would stay] in the role as ADNS once the new DNS was hire[d]." (Doc. 47 at 3). Even if Burch did lie to Kretzschmar out of desperation, that in no way suggests, and is certainly not evidence, that "Kretzschmar was never the intended ADNS because she was African American," as she argues in her response. (*Id.*) Indeed, it was Burch who hired Kretzschmar, which gives rise to a permissible inference that no discriminatory animus motivated her decision not to promote Kretzschmar to ADNS. *See Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (the fact that the same individual who hired and promoted the plaintiff was also responsible for terminating him "give[s] rise to a permissible inference that no discriminatory animus motivated" the employer's actions (emphasis omitted)); *Cole v. Mountain View Marketing, Inc.*, 744 F. Supp. 2d 1240, 1251 (S.D. Ala. 2010) (citing *Williams*). Kretzschmar has failed to rebut that inference.

In sum, Birmingham East has articulated legitimate, non-discriminatory reasons for not promoting Kretzschmar to ADON, all related to Burch's concerns about Kretzschmar's lack of professionalism. Kretzschmar has failed to make a

showing sufficient to permit a reasonable jury to find that the reasons articulated by Burch for not promoting her are false, much less that the true reason was racial discrimination. Accordingly, Birmingham East is entitled to summary judgment on Burch's claim for racial discrimination based on Birmingham East's failure to promote her to ADON.

### c. Kretzschmar's Suspension Claim

The Court's ruling on Birmingham East's motion to dismiss also allowed Kretzschmar to pursue her race discrimination claim with respect to her suspension in July 2013. Birmingham East has moved for summary judgment on that claim, arguing that Kretzschmar cannot establish a prima facie case and cannot, in any event, meet her burden to show that Birmingham East's articulated reasons for suspending her were a pretext for discrimination. (Doc. 42 at 17-20). In her response, Kretzschmar does not respond directly to any of Birmingham East's arguments relating to her discriminatory suspension claim. In fact, the arguments Kretzschmar advances in support of her discrimination claims address only her "demotion" (promotion denial) and ignore her suspension. (Doc. 47 at 15-18). As discussed above, Kretzschmar argues that she has established a prima facie case of discrimination with respect to her "demotion" and that Birmingham East's reasons for her "demotion" are pretextual, but she offers no similar arguments with respect

to her suspension.[22]  Consequently, a strong argument could be made that

Kretzschmar has conceded Birmingham East's arguments and that her

discriminatory suspension claim has been waived. *See Fischer*, 349 F. App'x at

375 n.2; *Childress*, 943 F. Supp. 2d at 1349.

The Court, however, is unwilling to go that far.  Notwithstanding

Kretzschmar's failure to respond directly to Birmingham East's arguments, she

does discuss the circumstances of her suspension at length in her response and does

highlight the differences between the suspensions she and Shaunnan Cook

(African-American) received and the suspension Amanda Gillott (Caucasian)

received. (Doc. 47 at 5-6).  Construing Kretzschmar's response broadly, the Court

is satisfied that Kretzschmar has not conceded Birmingham East's arguments and

has not waived her claim alleging discrimination as to her suspension.

Accordingly, the Court will not dismiss the claim outright, but will instead proceed

to analyze Birmingham East's arguments that Kretzschmar has not established a

prima facie case and has not met her pretext burden.

### 1. Prima Facie Case

To establish a prima facie case of racial discrimination under Title VII or

Section 1981, a plaintiff must show that "(1) she belongs to a protected class, (2)

she was subjected to an adverse employment action, (3) her employer treated

---

[22] Kretzschmar does discuss her suspension in the context of her separate retaliation claim.

similarly situated employees outside her protected class more favorably, and (4) she was qualified to do the job." *Blow v. Virginia College*, 619 F. App'x 859, 862 (11th Cir. 2015) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). Birmingham East argues that Kretzschmar has failed to make out a prima facie of discrimination with respect to her suspension because she has not identified a similarly situated comparator who was treated more favorably than she was. The Court agrees with Birmingham East.

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562. "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999). Here, Burch suspended Kretzschmar, Gillott, and Cook on July 22, 2013, after Gillott complained about the "threatening and racially derogatory" text messages she received from Kretzschmar and Kretzschmar complained that Gillott was "antagonizing" her. Burch suspended Kretzschmar, Gillott and Cook after checking with Crystal Robinson (African-American), the Regional Human Resources consultant to Birmingham East, who indicated that all of the allegations could potentially violate Birmingham East's harassment policy and advised Burch

to reopen her investigation to make sure she had all the relevant facts. (Burch Decl. at ¶ 16). Kretzschmar implies that Burch treated Gillott more favorably because she ended up suspending Gillott for three days with pay but suspended Kretzschmar for five days without pay. However, Burch did not find Gillott guilty of the same or nearly identical conduct as Kretzschmar. According to Burch, she was unable to uncover any evidence that Kretzschmar was being antagonized by Gillott or any evidence corroborating Cook's allegations that Gillott had made disparaging comments about Kretzschmar's job performance, allegations that Gillott expressly denied. Kretzschmar, on the other hand, admitted sending the text messages in which she accused Gillott of being a "back stabber," warned Gillott that "your time will come too," and referred to Gillott, Leslee Watkins, and Sandy Copeland (all Caucasian) as "you people" (doc. 43-4 at 27, 29), all premised upon unsubstantiated hearsay she had been told by Cook. This conduct is not the same as or nearly identical to Gillott's conduct, even assuming that Gillott made negative comments about Kretzschmar to Cook (but not to Kretzschmar herself). Gillott, therefore, is not a similarly situated comparator for purposes of Kretzschmar's suspension claim.

Kretzschmar also cites an unrelated incident involving Gillott and Letosha Van Buren and seems to imply that the incident is further evidence of Burch's favorable treatment towards Gillott. In September 2012, Letosha Van Buren

(African-American) complained that Gillott had thrown a pair of scissors at her while using profanity. (Burch Decl. at ¶ 30; Van Buren Aff. at ¶ 5). Burch suspended Gillott pending an investigation. Burch ultimately confirmed that Gillott had directed profanity towards Van Buren, but also learned that Gillott had not thrown the scissors as alleged (rather, Gillott slid the scissors across the floor to Van Buren). (Burch Decl. at ¶ 30). Burch brought Gillott back to work from her suspension and issued her a Corrective Counseling Memo. (*Id.*) Burch did not pay Gillott for the time she missed. (*Id.*)

Again, Gillott is not a similarly situated employee for purposes of Kretzschmar's suspension claim. The "scissors" incident between Gillott and Van Buren and the "text messaging" incident between Kretzschmar and Van Buren are not remotely similar and occurred ten months apart. Even if the two incidents were similar, and even if the quality of Gillott's conduct towards Van Buren could be considered "nearly identical" to the quality of Kretzschmar's conduct towards Gillott, Burch suspended Gillott without pay for her conduct towards Van Buren, thereby treating Gillott in the same manner as she later treated Kretzschmar.[23]

---

[23] Kretzschmar also argues that Gillott was the "true racist," citing allegations made by Van Buren in her affidavit that Gillott made some racial remarks at some unidentified time. (Doc. 47 at 10; Van Buren Aff. at ¶¶ 2-3). Not only are Van Buren's allegations hearsay, Van Buren does not state in her affidavit that she ever brought her allegations to Burch's attention, and there is no evidence that Burch was aware of Gillott's alleged statements.

Accordingly, because Kretzschmar has not identified a similarly situated comparator who was treated more favorably than she was, she has failed to establish a prima facie of discrimination with respect to her suspension.

## 2.    Pretext

Even if Kretzschmar were able to establish a prima facie case, Birmingham East has again articulated a legitimate, non-discriminatory reason for its decision to suspend Kretzschmar —Kretzschmar's potential violation of Birmingham East's harassment policy. *See, e.g., Usry v. Reg'l Med. Ctr., Inc.* 560 F. App'x 883, 888 (11th Cir. 2014) (employer's explanation that it terminated plaintiff because she violated company policy constituted a "valid, nondiscriminatory" reason for the termination).  Indeed, Burch suspended not only Kretzschmar but Gillott and Cook as well, based on the recommendation of Crystal Robinson, who indicated to Burch that all of the underlying allegations between the parties could violate the harassment policy.

 Kretzschmar has failed to demonstrate that Birmingham East's articulated reason for suspending her is false or that the real reason was discrimination.  As discussed above, Burch suspended all three of the employees who were involved in the underlying incident, not just Kretzschmar.  After conducting a further investigation, Burch was unable to corroborate the allegations Cook had made about Gillott, while Kretzschmar admitted sending the offending text messages to

Gillott based on the hearsay she had been told by Cook. Under these circumstances, Burch determined that Kretzschmar's conduct was the most serious and imposed a harsher suspension on her than on Gillott (and Cook).

Kretzschmar has not pointed to any deficiencies in Burch's investigation (other than to question the "subjective" nature of the investigation) or offered any evidence that Burch did not conduct the investigation in good faith. Rather, she quarrels with Burch's conclusion that her actions were inappropriate. Kretzschmar does not deny sending the underlying texts to Gillott, but argues that there was no racial animus behind the texts and that the texts were not meant to be threatening. (Kretzschmar Dep. at 155-58). She characterizes them as "text messages … amongst friends who happened to be colleagues" and notes that the texts "were done outside of work," implying that there was nothing wrong with her sending the texts. (Doc. 47 at 5). Burch, however, determined that the texts were inappropriate and unprofessional and warranted a suspension, and Kretzschmar "cannot succeed by simply quarreling with the wisdom" of Burch's decision. *Chapman*, 229 F.3d at 1030. Even if Burch was mistaken in her findings, that would not be enough to show pretext. "[A] plaintiff cannot show pretext merely by showing that an employer's good faith belief that the plaintiff engaged in misconduct is mistaken." *Rawls v. State Dep't of Human Res.*, 507 F. App'x 895, 898 (11th Cir. 2013); *see Usry*, 560 F. App'x at 889 ("Plaintiff Usry has presented evidence from which a

58

jury could conclude that the results of [the employer's] investigation were wrong and that [the employer] made a poor decision when it terminated Usry. … But that is not enough to show pretext ….").

As before, Kretzschmar has failed to make a showing sufficient to permit a reasonable jury to find that Burch's articulated reason for suspending her is false, much less that the true reason was racial discrimination.  She has failed to meet her burden to show pretext.  Birmingham East is entitled to summary judgment on Burch's claim for racial discrimination based on her suspension.

### 3.  Kretzschmar's Retaliation Claims

#### a.  Retaliatory Discharge

The Court's ruling on Birmingham East's motion to dismiss also allowed Kretzschmar to pursue her claims under Title VII and Section 1981 alleging retaliatory discharge.  To establish a claim of retaliation under Title VII or Section 1981, a plaintiff must prove that "[s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some casual connection between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2410–16, 165 L. Ed. 2d 345 (2006)).  The causal connection must be proved according to "traditional principles of but-for causation," which requires proof "that the unlawful retaliation would not have occurred in the

absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). If the plaintiff establishes a prima facie case of retaliation, the employer must "articulate a legitimate, nonretaliatory reason for the challenged employment as an affirmative defense to liability." *Goldsmith*, 513 F.3d at 1277. "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id.*

Although it is not entirely clear from Kretzschmar's response to Birmingham East's motion for summary judgment, Kretzschmar appears to be alleging that she was "terminated" in September 2013 in retaliation for opposing her alleged "demotion" and for complaining about discrimination and threatening to get a lawyer.[24] (Doc. 47 at 19-20). Birmingham East argues that even assuming Kretzschmar engaged in protected activity (which Birmingham East does not concede), her retaliatory discharge claim fails because she was not terminated; rather, she resigned. (Doc. 42 at 30; Doc. 50 at 19-20). *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir.1999) ("Plaintiff failed to establish that he suffered an adverse employment decision because he voluntarily resigned."); *Yates v. City of Birmingham*, 2016 WL 826730, *10 n.3 (N.D. Ala. Mar. 3, 2016)

---

[24] Nowhere in Kretzschmar's response does she allege that she was terminated in retaliation for filing her EEOC Charge. Indeed, the evidence is undisputed that Burch was unaware that Kretzschmar had filed the charge at the time of her termination/resignation. (Burch Decl. at ¶ 26).

(voluntary employment decisions cannot be considered adverse). Birmingham East points to the email Kretzschmar sent to Burch on September 8, 2013, in which Kretzschmar informed Burch that she no longer wished to have full-time employment at the facility, that she only wanted to work "PRN" at that time, and that she would come in a few days a week "until you find someone to replace me." (Doc. 43-4 at 40). Birmingham East argues that Burch reasonably interpreted Kretzschmar's email as a resignation, which she accepted the next day. (*Id.*) Kretzschmar retorts that she never resigned, noting that she did not use the word "resign" in her email. (Doc. 47 at 12). She contends that Burch "terminated" her when she "asked to go PRN." (*Id.*)

The Court finds Kretzschmar's email to be ambiguous. It is not clear whether Kretzschmar was advising Burch that she wanted to change her employment status from full-time to PRN, or whether she was resigning and was offering to work PRN only until she was replaced. Ultimately, however, it does not matter whether Kretzschmar resigned or was terminated. Even assuming that Kretzschmar was terminated and that she can establish a causal connection between her termination and her "protected activity," Birmingham East has articulated a legitimate, non-retaliatory reason for ending its employment relationship with her: Birmingham East does not allow employees to unilaterally announce that they are changing their employment status from full-time to

permanent PRN, and the facility had no need for an MDS Coordinator who worked on only a PRN basis. (Burch Decl. at ¶ 24). Kretzschmar has adduced no evidence that this legitimate reason for terminating her (or, as Burch contends, accepting her resignation) was pretextual. In fact, Kretzschmar admitted at her deposition that the MDS Coordinator position is a full-time position. (Kretzschmar Dep. at 285).

In sum, even assuming that Kretzschmar could somehow make out a prima facie case of retaliatory discharge, Birmingham East has stated a legitimate, non-retaliatory reason for its action, and Kretzschmar has not met her burden to show pretext. Kretzschmar's retaliatory discharge claim is due to be dismissed.

### c.     Kretzschmar's Claim for Other Retaliatory Acts

Lastly, the Court allowed Kretzschmar to pursue her claim under Section 1981 for alleged retaliatory acts other than discharge. Although it is not clear from Kretzschmar's amended complaint exactly what other retaliatory acts she is complaining about, her response to Birmingham East's motion for summary judgment appears to identify four alleged acts of retaliation: (1) being "demoted" in July 2013, (2) being suspended in July 2013, (3) being issued a written corrective counseling for her medication error in July 2013 (improperly completing a resident's MAR and then failing to properly dispose of the narcotic medication), and (4) being denied vacation in August 2013. (Doc. 47 at 11-2, 18-20). Birmingham East has moved for summary judgment on all four alleged acts.

With respect to Kretzschmar's allegation that her "demotion" in July 2013 was an adverse employment action for purposes of her retaliation claim, Birmingham East argues that Kretzschmar's alleged "protected activity" could not have been the "but for" cause of her demotion. The Court agrees. Kretzschmar testified unequivocally at her deposition that the first time she complained about discrimination and harassment in the workplace (her alleged protected activity) was when she sent her email to Burch on July 19, 2013, complaining about working in a hostile work environment. (Kretzschmar Dep. at 165-66, 170; Doc. 43-4 at 30). It is undisputed, however, that Burch informed Kretzschmar no later than July 15, 2013, that she had decided not to make Kretzschmar the ADNS (the alleged "demotion"). Therefore, Kretzschmar's protected activity could not have been the cause of her demotion. By Kretzschmar's own admission, she did not engage in any protected activity until after she had been demoted.[25]

With respect to Kretzschmar's allegation that her suspension in July 2013 was an act of retaliation, the Court has already discussed the suspension in the context of Kretzschmar's race discrimination claim. As discussed above, Birmingham East has articulated a legitimate reason for suspending Kretzschmar—

---

[25] The Court notes that the counseling memorandum Burch gave to Kretzschmar on July 18, 2013, references Kretzschmar's conversation with the Human Resources Director that day, during which Kretzschmar allegedly commented that she had an attorney and would be suing Birmingham East for discrimination. (Doc. 43-34 at 26). At her deposition, Kretzschmar did not recall making any such comments. (Kretzschmar Dep. at 164-65). In any event, even if Kretzschmar did make the comments, the comments were still made after she had been demoted.

Burch's determination that the text messages Kretzschmar sent to Amanda Gillott were inappropriate and unprofessional.  Kretzschmar has not shown that Burch's reason was a pretext for discrimination or for prohibited retaliatory conduct.

To the extent that Kretzschmar's retaliation claim is based on Burch's decision to give Kretzschmar a written corrective counseling on July 29, 2013, after she committed a medication error, Birmingham East argues that the corrective counseling was not an "adverse employment action" for purposes of her retaliation claim. (Doc. 42 at 27).  The Court agrees.  In the retaliation context, whether a challenged action is an "adverse employment action" is determined by whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).  Here, no reasonable employee would have found the corrective counseling Burch issued to Kretzschmar for her medication error to be materially adverse, given that it had no impact on Kretzschmar's salary or job status.  Likewise, the mere issuance of the corrective counseling would not have deterred a reasonable employee from making or supporting a charge of discrimination. *See Barnett v. Athens Reg'l Med. Ctr.*, 550 F. App'x 711, 715 (11th Cir. 2013) ("[N]either the reprimands, the negative evaluation, nor the denial of Barnett's vacation request were adverse employment actions.  There was no

evidence Barnett suffered harm from any action that would have deterred a reasonable employee from making or supporting a charge of discrimination. In particular, nothing in the record showed that these acts were materially adverse in that they would have affected any future pay raise or his future job status in any way." (internal citation omitted)). Because the corrective counseling Burch issued to Kretzschmar was not an adverse employment action, Kretzschmar cannot establish a prima facie case of retaliation with respect to that action.

Moreover, even if Kretzschmar were able to establish a prima facie case, Birmingham East has articulated a legitimate reason for issuing the corrective counseling—Burch's determination that Kretzschmar improperly completed the resident's MAR and failed to properly dispose of the narcotic medication. (Burch Decl. at ¶ 20-21). In addition, it is undisputed that Burch has disciplined other nurses for similar medication errors, including Caucasian nurses. (*Id.* at ¶ 21). There is no evidence of pretext.

Lastly, Kretzschmar alleges that Burch retaliated against her when Burch allegedly denied her request for vacation in August 2013.[26] As before, Birmingham East argues that the denial of Kretzschmar's vacation request, assuming the request was in fact denied, was not an adverse employment action.

---

[26] As previously noted, Birmingham East's payroll records reflect that Kretzschmar took two vacation days in August 2013 and was paid for both days. (Burch Decl. at ¶ 23; Doc. 43-5 at 46-49).

Again, the Court agrees. *See Barnett*, 550 F. App'x at 715 ("[T]he denial of a vacation request would not have deterred a reasonable employee from making, or supporting, a discrimination charge.").  Furthermore, once again assuming that Kretzschmar would be able to establish a prima facie case of retaliation, Kretzschmar admits that her vacation request was denied (if at all) because her delinquent MDS assessments were not complete (Kretzschmar Dep. at 251), a legitimate, non-retaliatory reason for denying the request.  Indeed, MDS assessments must be completed and submitted to the Center for Medicare and Medicaid Services before Birmingham East can receive reimbursement for the services it provides, and there is a time limit for completion of the assessments. (Burch Decl. at ¶ 23).  Kretzschmar has not shown that Birmingham East's concern that she was behind in her MDS assessments was a pretext for retaliation.

For all of the above reasons, Birmingham East is entitled to summary judgment on Kretzschmar's claim for retaliation based on acts other than termination.

## CONCLUSION

Based on the foregoing, Birmingham East's motion for summary judgment (doc. 41) will be granted in its entirety and its motion to strike (doc. 51) will be granted in part and denied in part.  An appropriate order consistent with this opinion will be entered.

**DATED** this 19th day of May, 2017.

_John E. Ott_
_____
**JOHN E. OTT**
Chief United States Magistrate Judge